**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:18-cv-00037**

JOSEPH MCGRANAHAN                                                                      PLAINTIFF

v.

KDOC, et al.                                                                                      DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Defendants, Wesley Burnett ("Burnett"), Jesse Coombs ("Coombs"), Darren Larue ("Larue"), Andrew Rasmussen ("Rasmussen"), and Gage Rodriguez ("Rodriguez"), (collectively, "Defendants") Motion for Summary Judgment. [DN 33.] Plaintiff Joseph McGranahan ("McGranahan") has responded. [DN 39.] Defendants have replied. [DN 40.] For the reasons that follow, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [DN 33] is **GRANTED**.

**I.  Background**

On Saturday May 13, 2017 at approximately 9:55 a.m. Coombs approached McGranahan's cell on 13-Right Cell 13 in Three Cell House Restrictive Housing Unit. [DN 33-2 at PageID 177.] Coombs told McGranahan he was moving to a different cell in the unit and ordered him to pack his things. [*Id.*] Coombs states McGranahan refused to comply and shouted "F--- you. Do what you have to do." [*Id.*] Coombs then formed a Cell Entry Team to remove McGranahan from his cell. [*Id.* at PageID 178.] McGranahan picked up a cup in his cell and according to Coombs stated "F--- you; come get it." [*Id.*] McGranahan states he said "f--- you Coombs, come and get me" and then Coombs began spraying him with O.C. spray. [DN 10 at PageID 62.] Coombs states McGranahan still refused to put the cup down and comply so Coombs again sprayed McGranahan with O.C. spray. [DN 33-2 at PageID 178.]

Rodriguez then arrived to McGranahan's cell and began recording with a video camera. [*Id.*] McGranahan was handcuffed and removed from his cell to be taken to a shower room after use of the O.C. spray. [*Id.* at PageID 179.] McGranahan was seated in a chair in the shower and Officer Burnett placed the electronic shield in front of McGranahan. [Extraction Video at 04:40.] Nurse Jessica Miller arrived soon after and took McGranahan's vitals. [Extraction Video at 04:41.] McGranahan's vitals appeared normal and officers informed him they would begin pouring water over his face to decontaminate him. McGranahan refused the water but was informed it was policy for officers to decontaminate him. [Extraction Video at 06:13-06:20.] Officers told McGranahan to let them know when he had enough water poured over him. [Extraction Video at 06:29.] Miller began pouring water over McGranahan's eyes and stopped as soon as he said he had enough. [Extraction Video at 06:30-06:32.]

The view from the camera is blocked but Defendants allege McGranahan attempted to spit water out of his mouth towards the staff. The electronic shield was then used by Burnett for approximately two seconds. [Extraction Video at 06:35-06:37.] Coombs then informed McGranahan that they would remove his wet boxers and replace them with a new pair. [Extraction Video at 06:55.] Officers raised McGranahan from the chair and placed him facing the shower wall with the electronic shield placed on his back. [Extraction Video at 07:13.] Again, the view is blocked but Defendants allege McGranahan attempted to kick Larue with his left foot while removing McGranahan's boxers. The electronic shield was again used by Burnett on McGranahan. [Extraction Video at 07:55-07:56.] The leg restraints were replaced and McGranahan was escorted to 11 Left Cell #7. 8:45-10:30.]

Once McGranahan was escorted to his cell, leg restraints and handcuffs were removed. [Extraction Video at 11:23-11:57.] Nurse Miller again checked McGranahan for injuries and

stated, "no injuries noted." [Extraction Video at 12:20-12:28.] She then checked his vitals and again stated, "no injuries noted." [Extraction Video 12:37-13:45.] McGranahan brought this case alleging excessive force.

## II. Legal Standard

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

"Not every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence. To support this position, he must present evidence on which the trier of fact could find for the plaintiff. *See id*. (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp*., 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938) a federal court in a diversity action applies the standards of Fed. R.

Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476 (1991)." *Gafford v. General Electric Co.,* 997 F.2d 150, 165 (6th Cir. 1993).

### III. Discussion

#### A. Affidavits of Defendants

In his Response, McGranahan first argues the Defendants are not competent to testify because they do not have firsthand knowledge of the events. Defendants only attached affidavits from Coombs, Lila Edmonson, Rasmussen and Rodriguez to the Motion for Summary Judgment. McGranahan's argument is based primarily on Rodriguez's statements. In his affidavit, Rodriquez stated that he was not in the shower cell and could not see McGranahan's face or body when he allegedly spit at the officers or when he allegedly kicked at Larue. [DN 33-10 at PageID 210.] However, both Rodriguez and Coombs were present during the incident at issue and can testify to what they observed at that time. Edmonson was not present during the incident at issue and does not seek to testify on those events. However, as the Medical Records Custodian, she is competent to testify to those records.

#### B. Excessive Force

Eighth Amendment claims by prisoners alleging excessive force must satisfy a two-prong standard. Initially, prisoners must show that the guard's actions were objectively harmful enough to create a constitutional claim. Second, the prison official's act must have been committed with the requisite state of mind. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The first "objective" component to the standard is measured with "contemporary standards of decency," *Id*., and dictates that "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* at 9. "This is true whether or not significant injury

4

is evident." *Id.* While the second "subjective" component does not have a fixed meaning, ultimately it is an analysis into the motivation of the action taken against the prisoner and if it was an "unnecessary and wanton infliction of pain." *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973)).

In measuring if the force used violates the protections of the Eighth Amendment, a court may consult a number of different factors. For instance, a court might use the gravity of the injury suffered by the inmate. *Id.* Other factors a court may consider include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.*

   1. **Subjective Component**

       a. **Need for Application of Force**

"Because prison officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance, we must grant them wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002) (internal quotations omitted). "Of course, [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Moore v. Parker*, 2015 WL 3407414, at *4 (W.D. Ky. May 26, 2015). The Court must determine

"whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir.2010). "[T]he reasonableness of a defendant's actions is an appropriate matter to determine on summary judgment." *Id.*

Here, McGranahan was sprayed with O.C. prior to the recording beginning. Coombs states he ordered McGranahan to pack his property because he was being moved to another cell. Coombs further states McGranahan refused to comply with orders to pack his property. Although McGranahan disputes refusing to move, he agrees that he did shout "f--- you Coombs, come and get me." Coombs then sprayed the O.C. spray. It was certainly plausible for Coombs to believe that McGranahan would not comply with orders after he shouted obscenities and specifically said "come and get me."

Coombs states the second burst of O.C. spray was used after McGranahan refused to put down a cup "with an unknown liquid inside". McGranahan states Coombs did not order him to put the cup down but does not deny he was in fact holding a cup. Coombs argues he only sprayed a second time out of fear that the cup McGranahan was holding contained feces or urine and because he again stated "f--- you Coombs, come and get me." McGranahan states the cup only had water in it. However, when viewing the evidence Coombs was privy to at that moment, the Court finds it was plausible and reasonable to believe the cup could contain feces or urine and that O.C. spray was necessary. McGranahan does not argue Coombs knew at that moment that the cup only contained water. Considering McGranahan's language directed at Coombs and the fact Coombs was unsure of the contents of the cup, it was plausible for Coombs to think use of O.C. spray was necessary.

McGranahan cites to *Williams v. Curtin,* to support his position that the O.C. spray was excessive. In *Williams,* Williams was ordered to pack up his cell. 631 F.3d 380, 382 (6th Cir. 2011). In response he stated, "What for, sir?". *Id.* An officer then responded with an "assault squad" and released a "chemical agent" into the cell. *Id.* The Court found that at that stage of litigation—initial screening of the Complaint—Williams alleged sufficient facts that excessive force was used.

Here, by McGranahan's own admission, he did not respond to Coombs in the manner Williams did. McGranahan cursed at Coombs and said, "come and get me." The Sixth Circuit held "the use of…chemical agents against recalcitrant prisoners" did not violate the Eighth Amendment. *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (quoting *Caldwell v. Moore,* 968 F.2d 595, 600 (6th Cir.)). Although McGranahan states he was never told to put the cup down, his statement to Coombs shows he was a recalcitrant inmate at that time. Therefore, the need for O.C. spray was plausible.

Next, McGranahan states he was "doused with ice cold water by Nurse Jessica Miller on more than one occasion while simultaneously being electrocuted and shocked on more than one occasion while inside of the shower." [DN 29 at PageID 245.] However, this is partly contradicted by the video. Miller began pouring water over McGranahan's eyes and stopped as soon as he said he had enough—which was only two seconds later. [Extraction Video at 06:30-06:32.] This was the only time water was poured on McGranahan. Further, McGranahan was not shocked with the shield until Miller stopped pouring water. [Extraction Video at 06:35.]

Coombs and Burnett both state that McGranahan attempted to spit water at staff. McGranahan states he was trying to catch his breath and was not trying to spit on anyone. He further states Defendants perceived those actions as an attempt to spit on them. Even with this

Court adopting McGranahan's explanation that he was not attempting to spit on anyone and was simply trying to catch his breath, it was plausible for Burnett and Coombs to think McGranahan was attempting to spit at the staff. McGranahan's face was not covered with the shield at the moment Burnett and Coombs allege he attempted to spit at staff. Burnett acted in "good faith effort to maintain or restore discipline" when he used the shield. *Hudson*, 503 U.S. at 6.

It was also plausible for officers to believe McGranahan was attempting to kick Larue while changing his boxers. McGranahan again states that Defendants perceived his trembling as a kick. On video, officers can be heard directing McGranahan how to lift his legs out of his boxers. [Extraction Video at 07:45.] Twice they tell him, "straight up, do not lift it back." After the second warning, Burnett used the electronic shield for one second. [Extraction Video at 07:55-07:56.] Even when viewing McGranahan's statement that he trembled as factual, it was plausible for Burnett to view that as an attempted kick to Larue. "[P]rison officials may use appropriate force to regain control of an aggressive inmate." *Cordell v. McKinney*, 759 F.3d 573, 581 (6th Cir. 2014). Based on the information at that time, it was plausibly necessary for Burnett to use the electronic shield to control McGranahan.

### b. Relationship Between the Need for and the Amount of Force Used

"[C]ourts have held that the use of pepper spray constitutes excessive force in violation of the Eighth Amendment in three situations – where an officer has used more than a reasonable quantity of pepper spray, where an inmate has been pepper-sprayed without a prior warning, and where officers withhold appropriate medical attention after an inmate was pepper-sprayed." *Lawrence v. Thompson*, 2016 WL 3406158, at *4 (W.D. Ky. June 17, 2016).

Here, McGranahan alleges there was no reason for any use of O.C. spray. However, he does not refute Coombs claim that two short bursts of O.C. spray were used. "[U]se of [O.C. spray]

in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979). Although McGranahan denies refusing to move, and the Court views that at true, it does not negate the other provocation that was present at that moment. There was a reasonable possibility that slight force would be required after McGranahan cursed at Coombs while holding a cup with an unknown liquid. Two short bursts of O.C. spray is not more than a reasonable quantity.

McGranahan also was not sprayed without warning. In his Amended Complaint, he states Coombs told him he was not being compliant and McGranahan saw him with the pepper spray. He again admits that Coombs did not begin spraying until he cursed at Coombs and said, "come and get me." [DN 10 at PageID 62.] This case is unlike *Torres* where Roberson was sleeping under his blanket when gas was unexpectedly deployed into his cell. 770 F.3d 398 at 400-401. McGranahan was aware that O.C spray was about to be used on him.

Medical attention also was not withheld from McGranahan. After he was sprayed with O.C. Rodriguez arrived with the video camera. Coombs begins telling McGranahan to disrobe and McGranahan complies initially. [Extraction Video at 00:30.] Soon after Coombs orders him to remove his socks so he can be taken to decontamination. [Extraction Video at 00:53.] McGranahan does not comply with this order and is told again. [Extraction Video at 01:03 and 01:05.] McGranahan then complies and begins removing his socks. [Extraction Video at 01:20.] He was escorted to the shower and decontamination began shortly after arrival. Although McGranahan characterizes Defendants pouring water over him as a torture tactic, it is clear Defendants were attempting to treat McGranahan after the use of the O.C. spray. There is no evidence that Defendants withheld treatment. In fact, a nurse was called to evaluate McGranahan's status prior

9

to decontamination. Any delay in treatment was minimal and due to McGranahan not initially complying with orders. There is no evidence that Coombs continuously and indiscriminately used the O.C. spray. There is no indication that Coombs used more spray than necessary.

McGranahan states "[t]here was no relationship between the need for and the amount of force used because McGranahan wholly complied and was cuffed after being maced/peppersprayed". [DN 39 at PageID 247.] This Court has already found it was reasonable for Burnett to deploy the electronic shield. Now the Court will evaluate whether Burnett exceeded the force necessary.

It can clearly be heard on video when Burnett deploys the electronic shield the first time. The shock lasts for approximately two seconds. [Extraction Video at 06:35-06:37.] After Burnett administers the shock, there is no further act of force by Defendants. Coombs states, "are you going to resist now McGranahan?" and McGranahan responds "no". [Extraction Video at 06:50.] The shock Burnett administered the second time lasted approximately one second. [Extraction Video at 07:55-07:56.] Immediately after the shock is administered, officers again instruct McGranahan to lift his leg straight up. [Extraction Video at 07:57.] Larue continued to change McGranahan's boxers after the shock was administered. There is no evidence that Burnett continuously deployed the electronic shield on McGranahan either time. Both shocks were administered "to regain control of an aggressive inmate" and lasted no longer than necessary. The force administered was in direct proportion to the perceived threat. Immediately after the shocks were administered, officers continued the tasks they were doing prior to the administration of the shocks. Therefore, the amount of force used was proportionate to the need of force.

    c.  **Extent of Injury Inflicted**

McGranahan states "the severity of McGranahan's injuries of being burned from the electrical shocking shield and the severe headaches he suffered shows that the officers acted with malice". [DN 39 at PageID 248.] However, this is contrary to case law.

In *Hardrick,* Griffin suffered a broken leg as a result of a "leg-sweep maneuver" by Hardrick. 604 F.3d at 952. The broken leg required surgery, eight screws, and a metal plate. *Id.* The Court found that Hardrick was justified in using the leg-sweep maneuver and the severity of the injury was not enough alone to satisfy the subjective requirement of wantonness. *Id.* at 956.

Here, McGranahan alleges he suffered "[b]ruises from handcuffs and shackles. Swollen wrists and ankles. Bruise marks on [his] back, shin, arms from being slammed to the wall and handled really rough. Burn marks from the shield." [DN 1 at PageID 5.] Those injuries are much less severe than the ones suffered by Griffin. The Medical Records Custodian—Lila Edmonson—found one entry into McGranahan's medical file in the relevant timeframe. On May 21, 2017, McGranahan complained of migraines that started seven days prior. [DN 33-9 at PageID 208.] Seven days prior would have been May 14, 2017—the day after this incident. McGranahan was given "Tylenol 325 mg 2 tablets as needed orally for 10 days." [*Id.*] Nowhere in his file is there evidence that he sought treatment for bruises, burns, or swollen wrists and ankles. Further, Nurse Miller evaluated McGranahan twice and noted no injuries. The injuries complained of by McGranahan are *de minimis*. See *Jarriet v. Wilson,* 162 Fed. Appx. 394, 401 (6th Cir. 2005) ("[S]welling, pain, and cramps…[constitute] nothing more than a *de minimis* injury"); *Ratliff v. DeBaun,* 22017 WL 4365802 *8 (W.D. Ky. Sept. 29, 2017) (Two burn marks on Ratliff's arm were *de minimis*); *Harbin v. Eaves,* 2015 WL 3687468 *3 (W.D. Ky. June 12, 2015) ("A bruise and a scratch—even assuming Harbin's version of events—hardly reflect that the amount of force was constitutionally excessive.");*Gordon v. Joyner,* 2010 WL 3001967 (W.D. Ky. July 28, 2010)

11

(Plaintiff suffered redness and swelling and was proscribed ice and painkillers). McGranahan, at worst, suffered bruising, swelling, a burn, and a migraine even though he only sought treatment for a migraine. These injuries are not more than *de minimis*.

### d. Perceived Threat and Efforts to Temper Severity of Force

As the Court previously stated, although the perceived threats were not captured on video, McGranahan does not deny committing the acts. He only argues that they were not intended as Defendants interpreted them. The Court has found that at that time Defendants reasonably perceived threats posed by McGranahan. McGranahan states he was placed in a submissive hold with his head between his ankles. However, this is refuted by the video. At no point, from the moment officers removed McGranahan from his cell to placing him back in his cell was he ever bent over and placed in a submissive hold. Officers made sure McGranahan was checked twice by a nurse after force was used. McGranahan was taken to decontamination shortly after the O.C. spray was used. Defendants promptly provided care to McGranahan and used no more force than plausibly necessary at that time. Although the nature of the injury suffered is not dispositive, "[g]iven the *de minimis* injuries, it cannot reasonably be concluded that [Defendants'] response showed lack of good faith or a malicious and sadistic intent to cause harm to [McGranahan]." *Harbin*, 2015 WL 3687468, at *5 (W.D. Ky. June 12, 2015).

### 2. Objective Component

"The objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams*, 631 F.3d at 383. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson,* 503 U.S. at 9. Although the Court has found McGranahan's injuries to be *de minimis*, that does not end the inquiry. "[E]ven where an injury to an inmate is minimal, it may still contravene the Eighth Amendment where it

was inflicted in a sadistic and malicious manner." *Cooper v. Bower*, 2017 WL 4682725, at *8 (W.D. Ky. Oct. 17, 2017). However, video evidence and McGranahan's own statements contradict his claim that force was used in a sadistic and malicious manner.

"The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10 (quoting *Whitley*, 475 U.S., at 327). Here, the force used was not repugnant to the conscience of mankind. Defendants did not engage in a sadistic use of force. Both parties agree that Coombs used two bursts of O.C. spray. McGranahan admits to yelling "f--- you Coombs come and get me" prior to the O.C. being used. McGranahan also only argues Defendants misinterpreted his actions that he was attempting to spit at them or kick Larue. Other than his bare assertions, McGranahan has produced no evidence of sadistic or malicious motive or act by Defendants.

McGranahan has failed to meet both the subjective and objective components of an excessive force claim. As such, this claim must be dismissed.

### 3. Defendants Rodriguez and Larue

McGranahan also has claims of excessive force against Defendants Rodriguez and Larue. McGranahan alleges Rodriguez placed him in restraints and took him to a chair in the shower. [DN 10 at PageID 62.] However, the video contradicts this. Rodriguez had no contact with McGranahan and solely records the incident. Without contact, it cannot be said Rodriguez used any force on McGranahan. However, "a correctional officer who observes an unlawful beating may, nevertheless, be held liable under § 1983 without actively participating in the unlawful beating." *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990). "An officer who fails to act to prevent the use of excessive force may be held liable under 42 U.S.C. § 1983 when 1) the officer observed

or had reason to know that excessive force would be or was being used; and 2) the officer had both the opportunity and the means to prevent the harm from occurring." *Settles v. McKinney*, 2013 WL 2151560, at *5 (W.D. Ky. May 16, 2013).

Here, the Court has already found that no excessive force was used. Even if excessive force was used, Rodriguez had no reason to know force would be used and did not have the opportunity to prevent the harm from occurring. Rodriguez was not present when the O.C. spray was used. Further, Rodriguez remained outside of the shower to record for the entirety of the incident occurring in the shower. [Extraction Video at 04:40.] In the moments prior to the use of the electronic shield, there was no indication that force would be used. Because Rodriguez was located outside the shower with multiple people between him and McGranahan, he could not see when the other Defendants reasonably perceived McGranahan attempting to spit at them or attempting to kick Larue. Due to Rodriguez's location during the incident outside of the shower and the multiple people in front of him, there was no opportunity for Rodriguez to prevent the electronic shield from being used. As such, Rodriguez cannot be liable for excessive force.

McGranahan states Larue held him in a chair while being shocked and water was being poured on him. [DN 10 at PageID 63.] Larue did restrain McGranahan in his seat during decontamination. He also removed and replaced McGranahan's boxers and removed and replaced the leg restraints. McGranahan argues the act of restraining him in the chair was excessive force. Larue can be seen on video standing in front of McGranahan with one hand on the electronic shield. [Extraction Video at 04:40.] McGranahan has not alleged any injuries that stem from Larue's actions. McGranahan alleges the use of excessive force occurred when the O.C. spray was used and when the electronic shield was used. Larue's contact with McGranahan cannot be characterized as excessive force. Therefore, the claim against Larue must be dismissed.

14

### 4. Defendant Rasmussen

McGranahan states Defendant Rasmussen held him in a chair while being shocked. However, Rasmussen was not involved in this incident. On the Extraordinary Occurrence Report Lieutenants Morrison and Coombs, Sergeant Rodriguez, Officers Burnett, Jewell, Conner, Massey, and Larue, Nurse Miller, and Captain Thomas are all listed as the staff members involved in this incident. [DN 33-12 at PageID 215.] Rasmussen states he saw himself in a stairwell on video but was not part of the extraction team that day. [DN 33-11 at PageID 213.] Further, each member of the extraction team introduced themselves on camera prior to extracting McGranahan from his cell. Rasmussen did not introduce himself on video. [Extraction Video at 02:40.] Due to Rasmussen not having any involvement with this incident, a claim cannot be sustained against him. Therefore, this claim must be dismissed.

### C. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity also balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

First, the Court must determine, based on applicable law and the facts viewed in the light most favorable to the plaintiff, if a constitutional violation occurred. *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002). Second, if the answer to the first question is yes, was the constitutional right "clearly established" at the time of violation. *Saucier v. Katz*, 533 U.S. 194 (2001). "[B]oth

[questions] must be answered in the affirmative for the case to go to a factfinder to decide if each officer's conduct in the particular circumstances violated a plaintiff's clearly established constitutional rights. If either one is not satisfied, qualified immunity will shield the officer from civil damages." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). "The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Washington v. Newsome*, 977 F.2d 991, 995 (6th Cir. 1992) (citing *Wegner v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

"[A] defendant must first show "facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *McMillen v. Windham*, 2020 WL 3964781, at *4 (W.D. Ky. July 13, 2020) (quoting *Gardenhire v. Schubert,* 205 F.3d 303, 311 (6th Cir. 2000). "The burden then shifts to the plaintiff to show 'that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct.'" *Id.* (quoting *Estate of Hill v. Miracle,* 853 F.3d 306, 312 (6th Cir. 2017)). The Court will address whether a constitutional violation occurred first.

This Court has already found McGranahan has not presented sufficient facts to establish a violation of a constitutional right. The acts by Defendants at the time they were taken were plausibly necessary. Without evidence of a constitutional violation, Defendants are entitled to qualified immunity. However, even if a constitutional violation did occur, the second factor still entitles Defendants to qualified immunity.

McGranahan has not provided evidence that a reasonable official would have clearly understood that he or she had a duty to refrain from such conduct. At the moment O.C. spray was used, McGranahan was cursing at Coombs and was holding a cup with an unknown liquid in it. At

that moment, a reasonable officer could have deemed McGranahan noncompliant and thought some force would be needed to gain compliance. Further, a reasonable officer could have deemed use of the electronic shield necessary when Defendants reasonably believed McGranahan was spitting and kicking at them. Given the situation, this Court finds that it was not clear to a reasonable officer that O.C spray nor use of the electronic shield were necessary. Therefore, Defendants are entitled to qualified immunity.

## IV. Conclusion

For the above stated reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [DN 33] is **GRANTED**. A separate Judgment will be entered.

**IT IS SO ORDERED.**

Thomas B. Russell, Senior Judge
United States District Court

August 6, 2020

cc: Joseph McGranahan
    262084
    Little Sandy Correctional Complex
    505 Prison Connector Road
    Sandy Hook, KY 41171
    PRO SE